UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NICOLE JOHNSON, Parent, and N.S., | * | |
| a minor, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:15-cv-10026-ADB |
| | * | |
| BOSTON PUBLIC SCHOOLS and | * | |
| MASSACHUSETTS BUREAU OF | * | |
| SPECIAL EDUCATION APPEALS, et al., | * | |
| | * | |
| Defendants. | * | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

Plaintiff Nicole Johnson ("Plaintiff" or "Parent"), on behalf of her minor child N.S. ("Student") seeks judicial review of a decision by the Massachusetts Bureau of Special Education Appeals ("BSEA"), in which the BSEA determined that the Individualized Education Plans ("IEPs") and school placement proposed by Defendant Boston Public Schools ("BPS") satisfied BPS's obligation to offer Student a free and appropriate public education ("FAPE"), as mandated by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*

Before the Court is BPS's Motion for Summary Judgment. [ECF No. 90]. Defendant BSEA joins in the Motion. [ECF No. 128]. Plaintiff has filed an Opposition [ECF No. 101]. For the reasons set forth in this Memorandum and Order, BPS's Motion for Summary Judgment is ALLOWED, and the decision of the BSEA is hereby AFFIRMED.

## I.   BACKGROUND

### A.  Statutory framework

"A state receiving federal funds under the IDEA must offer every disabled child within its jurisdiction a FAPE in the least restrictive environment possible." Sebastian M. v. King Philip

Reg'l Sch. Dist., 685 F.3d 79, 84 (1st Cir. 2012) (citing 20 U.S.C. § 1412(a)(1), (5)). "If a state is unable to provide a disabled child with a FAPE through a public school placement, it may be obliged to subsidize the child in a private program." Id. (citing D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 34 (1st Cir. 2012)).

"The 'primary vehicle' for delivery of a FAPE is an IEP." D.B., 675 F.3d at 34; see also D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010) (the IEP is the "'centerpiece' of the IDEA's system for delivering education to disabled children"). An IEP must be "custom-tailored" to the child, see Sebastian M., 685 F.3d at 84, and "must include, 'at a bare minimum, the child's present level of education attainment, the short- and long-term goals for his or her education, objective criteria with which to measure progress towards those goals, and the specific services to be offered.'" Id. (quoting Lessard v. Wilton Lyndeborough Coop. Sch. Dist., 518 F.3d 18, 23 (1st Cir. 2008)). An IEP need, not, however, "furnish a disabled child with the maximum educational benefit possible." Id. Rather, to comply with the IDEA, an IEP "need only be reasonably calculated to confer a meaningful educational benefit." Id. (internal quotations and citation omitted).

"To ensure the continued adequacy of a child's IEP, the IDEA requires that it be reevaluated annually through a collaborative process that involves the child's parents and educators." D.B., 675 F.3d at 35. When parents are dissatisfied with their child's IEP, they may demand an administrative hearing before a designated state educational agency. Sebastian M., 685 F.3d at 84. In Massachusetts, that agency is the BSEA. "The burden of persuasion in the resulting hearing lies with the party challenging the IEP." D.B., 675 F.3d at 35. The final decision of the administrative hearing officer may be appealed to either a federal or state court of competent jurisdiction. Id. (citing 20 U.S.C. § 1415(i)(2)(A)).

**B.  Factual and procedural background[1]**

Student was born in August 2008 and developed profound deafness as an infant. <u>See</u> Administrative Record (hereinafter "AR") at 306. In December 2010, when Student was two and a half years old, he underwent surgery to receive a cochlear implant in his right ear. The implant was activated in January 2011, and Student attended periodic follow-ups for MAPping – *i.e.*, reprogramming of the cochlear implant processors. <u>Id.</u>  Student's official diagnosis was bilateral auditory neuropathy (auditory dys-synchrony). <u>Id.</u>

Student received early intervention services until he turned three years old, at which time he transitioned into a pre-school program at the Horace Mann School for the Deaf in Boston, Massachusetts ("Horace Mann"). <u>Id.</u> at 307. An evaluation performed in March 2011 showed that Student's gross motor, social-emotional, and self-care skills were all within normal limits, but that Student's language skills were significantly delayed. <u>Id.</u>

Student also received evaluations and services at Boston Children's Hospital. His primary providers were speech and language pathologist Denise Eng and pediatric psychologist Dr. Terrell Clark. <u>Id.</u> Student was evaluated on August 23, 2011, at which time his providers noted that Student communicated through vocalizations, but that he did not produce any words or word approximations during the assessment; did not appear to understand any spoken language; and did not respond to verbal requests. <u>Id.</u> Further, Student was not responsive to sign language, although Plaintiff (Student's mother) reported that she had completed a Family Sign Language

---

[1] These facts are drawn primarily from the Findings of Fact set forth in the Hearing Officer's January 2, 2015 Decision, which are supported by citations to hearing testimony and exhibits. <u>See</u> Administrative Record at 306-326. Neither party has raised any objection to the Hearing Officer's factual findings, and both parties have relied upon these findings in their respective filings on BPS' Motion for Summary Judgment. [ECF Nos. 90, 101].

Program. At that time, the clinicians estimated that Student's language was at the 20 to 21 month level. Id.

Records from Children's Hospital noted Student's inconsistent attendance at scheduled MAPping appointments and follow-ups. Id. In addition, the clinicians noted that Student did not appear to be wearing his device consistently, and Plaintiff confirmed that getting Student to wear the device was a struggle. Id. The clinicians emphasized to Plaintiff that it was essential for Student to build his base of language through American Sign Language ("ASL"). They recommended that Student's family members learn and use sign language to communicate with him, and that Student receive speech and language therapy. Id. at 307-308.

These recommendations were echoed by Elizabeth Drake, a school psychologist at Horace Mann, when she evaluated Student on October 3, 2011. Id. at 308. She encouraged his family members to learn ASL and use it "to allow for carryover of language" into the home. Id. She also stressed the need for Student to wear his processor for longer periods of time throughout the day. Id.

Student's IEP Team convened for the first time on October 14, 2011, when Student was three years old. At that time, the Team found him to be eligible to receive special education services from the City of Boston through the Early Childhood Program. Id. BPS proposed an IEP for the period of October 2011 through October 2012, which included specific goals for pre-reading and writing, math, socialization and transitional skills, to be acquired through a five-day per week program. Id. at 308-309. The IEP also noted that Plaintiff's goal was for Student to develop the skills he would need to be mainstreamed, preferably into a parochial school. Id. at 308. The 2011-2012 IEP called for Student's participation in a substantially separate classroom

taught by a teacher of the deaf. Id. It provided for instruction in both American Sign Language and Spoken English. Id. at 308-309.

In accordance with the IEP, Student participated in BPS' pre-school program at Horace Mann during the 2011-2012 school year. Id. at 309.

In December 2011, Student's outside therapist at Children's Hospital stopped seeing Student for outside therapy, reportedly because Student's attendance at appointments was inconsistent, and because of difficulties communicating with Student's family. Id. at 310.

The Student's IEP Team reconvened in November 2012. They noted that while Student had made some gains during the previous year, his language skills remained significantly delayed for his age. Id. at 309. The Team recommended that for the 2012-2013 year, Student continue to receive instruction in Sign-Supported English, with ASL as needed for comprehension. Id. The Team also recommended that Student continue to participate in the Early Childhood Program, and BPS offered Student participation in a substantially separate Kindergarten 1 program at Horace Mann. Id. at 310.

In December 2012, Student's classroom teachers reported that Student had made some progress. Specifically, he was able to sign several words spontaneously, to name his teacher and several classmates in sign language,  and to label and ask questions using simple words, or non-verbally. Id. He also imitated single words in sign and attempted to approximate speech in an effort to communicate. Id.

In January 2013, when Student was four and a half years old. Dr. Clark at Children's Hospital conducted a follow-up assessment, in which he noted that although Student was using his voice intentionally, he was not yet speaking using clearly articulated speech. Id. at 310-11. Student did, however, use gestures and signing, producing seven spontaneous/independent signs

during the evaluation. Id. Dr. Clark observed that Student's clearest form of communication was though signing. Id. at 310. Dr. Clark opined that "[c]ontinued use of signing is essential for [Student's] development of linguistic competence," and that signing would "serve as a bridge to comprehension of sounds and spoken language." Id. at 311, 411. The report further noted Dr. Clark's concern that Student was not wearing his processor on a full-time, daily basis. Id. at 311, 410-11.

On or about April 8, 2013, Student's Team reconvened at Plaintiff's request, to discuss Student's language of instruction. Id. at 311-12. Plaintiff communicated her desire that Student not be educated in ASL. Id. Instead, Plaintiff wished for Student to be instructed in Sign Supported Spoken English only. Id. at 312, 405. Although the Team discussed their concerns regarding Plaintiff's preference, they ultimately acquiesced to Plaintiff's request and updated Student's IEP. Id.

On or about June 21, 2013, Student lost his speech processor device, which was not replaced until approximately five months later. Id. at 312. Email communications amongst Plaintiff, Student's classroom teachers, staff at Horace Mann, and staff at Children's Hospital during this period note the difficulties associated with Student's inconsistent use of the processor, loss of his processor, efforts to obtain a replacement, Student's missing appointments, and some difficulties communicating with his family. Id. at 312.

Student's academic progress reports for the period ending June 2013 noted that Student was making slow progress, but his IEP Team nonetheless recommended that Student repeat his kindergarten year. Id. Plaintiff declined this recommendation and asked that Student be promoted. Id. Plaintiff also expressed that she did not want Student in classes with peers who used ASL or who had other, non-hearing-related disabilities. Id. at 312, 476.

In September and October 2013, Plaintiff expressed her dissatisfaction with Boston's program at Horace Mann, because Student had not yet developed Spoken English. Id. at 313-14. On September 16, 2013, Plaintiff met with Student's Team for a mediation meeting. Id. at 313, 430. Student's Team recommended that Student participate in an extra unscheduled evaluation to reassess his progress. Id. Plaintiff consented to a speech and language evaluation, a classroom observation, and a psychological assessment. She specifically rejected a home assessment, a health assessment, and an OT evaluation. Id. at 313, 430-31.

Marci Goldowski, a Speech and Language Pathologist at Horace Mann, performed Student's speech and language evaluation on October 7, 9, and 11, 2013. Id. at 314. To assess Student's comprehension through residual hearing, part of the testing was performed in Spoken English, without the benefit of amplification. Id.. Ms. Goldowski assessed Student's receptive language skills and concluded that when given single word signs, Student was able to understand vocabulary words as well as his hearing peers, but that his ability to understand spoken English without his processor was minimal. Id. at 315. This was in contrast to Plaintiff's reports to Ms. Goldowski, which stated that Student was able to hear and communicate in spoken English without wearing his processor. Id. When Ms. Goldowski assessed Student's receptive language abilities using Sign Supported Spoken English, also without the use of Student's processor, he demonstrated an ability to understand negatives in sentences, make inferences, understand the use of objects, and follow commands without the use of gestural cues. Id. He also demonstrated ability to understand some higher-level academic skills such as identifying colors and letters and understanding number concepts. Id. Ms. Goldowski remarked that Student's performance suggested that his ability to understand unconnected language was emerging. Id. Ms. Goldowski also tested Student's expressive language abilities without his processor. Student provided most

of his answers by using vocalizations accompanied by a sign. Id. Ms. Goldowski noted, however, that Student's scores on these tests showed that he fell below the mean, indicating impairments in his ability to express himself in sign or Spoken English. Id. at 315-316. Overall, Ms. Goldowski found Student's language skills to be significantly delayed, and she recommended that instruction continue to be delivered in Spoken English and Sign Supported English. She further stressed the importance of Student using his processor during all waking hours. Id. at 316.

Psychologist Liz Drake conducted the Student's psychological evaluation on October 16 and 17, 2013. Id. at 316-17. Her assessments suggested that Student's expressive and receptive abilities were stronger in sign-supported English, but that they were still significantly delayed. Id. From a social emotional standpoint, Student had improved his social interactions with peers, but he continued to have a low frustration tolerance level. Id. Ms. Drake noted that he would benefit from developing vocabulary to express his emotions, and she opined that it was essential for Student to be exposed to sign language in addition to Spoken English. Id. This recommendation was also echoed by Melissa Brown, who administered Achievement testing on October 17, 2013. Id. at 317.

Student's IEP Team reconvened on October 23, 2013 to discuss the results of his evaluations and develop an updated IEP for the 2013-2014 year. Id. at 318. The October 2013 IEP offered Student continued participation in a substantially separate day program at Horace Mann, with direct services as follows: thirty minutes per day, four times per week of communication skills with a speech and language therapist; communication skills 90 minutes daily; reading and writing skills 90 minutes daily; 80 minutes daily math skills (all taught by a teacher of the deaf); and 30 minutes of occupational therapy twice per week. The IEP also offered the use of an FM system to be used with Student's cochlear implant processor. Id. at 318-319.

Plaintiff, however, rejected the proposed program and placement set forth in the 2013-2014 IEP, stating that she was dissatisfied with Student's progress, and that she wanted Student to be in a class of peers without disabilities other than hearing loss. Id. at 319; 476, 712-713. Plaintiff also blamed BPS for losing Student's processor earlier that year, and she again expressed her preference that Student not be instructed in ASL. Id.

On October 10, 2013, Plaintiff filed a request for hearing at the BSEA, in which she proposed an out-of-district placement for Student, "so that his speech and communication with spoken language will be addressed and he will be with his peers." AR at 1-3. BPS responded to the request for a hearing and asserted that Horace Mann was an appropriate placement for Student. Id. at 13-14. The Hearing Officer scheduled a hearing for November 26, 2013. Id. at 10. Plaintiff, however, requested that the hearing be postponed until February 2014. Id. at 16. The Hearing Officer granted Plaintiff's request, and a number of pre-hearing teleconferences were held over the next several months. Id. at 18-21.

Plaintiff also requested that an independent evaluation be performed at the Clarke School for Hearing and Speech – a school for students with hearing impairments, where educators employ auditory training instead of sign language. BPS agreed to fund these evaluations, but the evaluations did not take place until March 2014. See id. at 500-532.

Student was also re-evaluated at Children's Hospital in December 2013. Id. at 320. A report authored by Denise Eng noted that Student's receptive and expressive communication skills remained limited, and that his family still did not sign. Id. at 320, 659-669. She recommended the consistent use of Student's processor through all waking hours, and the use of sign language for comprehension and to help support development of linguistic competence, continued direct speech, and language and aural rehabilitation therapy. Id.

Over the winter of 2013-2014, Student's teachers noted improvements in his academic progress notes, especially after Student regained use of his processor. Id. at 319-320. In January 2014, Plaintiff wrote to Ms. O'Malley (Student's classroom teacher) and expressed her appreciation for Ms. O'Malley's good teaching. Id. at 320, 625-626. Plaintiff also noted that Student had made improvements and learned a great deal in Ms. O'Malley's class. Specifically, Student had recently been able to write his name, sign and verbalize the letters, and showed improved counting skills. Id.

In early 2014, however, Plaintiff's relationship with the staff at Horace Mann began to deteriorate. Id. at 321. In February 2014, Plaintiff had an argument with the vice principal and a secretary that resulted in a breakdown of communication. After this incident, Plaintiff stopped sending the Student to school, and later withdrew Student from Horace Mann entirely. Id. She also sought an itinerant number for Student, so that he could receive speech and language services consistent with his IEP. At the time, Student was five years old and not yet of mandatory school age. Id.

In March 2014, Student underwent comprehensive testing at the Clarke School. Id. at 321, 500-532. Overall, Student's performance on the evaluations was comparable to a child who had just received a cochlear implant. Id. The evaluation noted that Spoken English was used in the home, and that Student did not wear his processor while being transported home by bus, due to parental concerns that he might lose it, or that the background sounds might be too loud. Id. at 321, 506. The Clarke evaluators noted the importance of full-time use of the speech processor, and recommended that Student be required to use spoken language or vocalizations any time he wanted something, to emphasize the value of spoken language. Id. at 321, 507. During Student's speech and language assessment, he used only three signs and natural hand gestures. Id. at 321, 515. The

evaluator recommended that Student be immersed in a small, language-based classroom, with five days per week of individual speech and language therapy; auditory habilitation services, and visual supports for spoken language such as pictures, gestures, and speech readings. Id. at 321-322, 516-520.

Student's IEP Team reconvened on May 7, 2014 to discuss the results of the Clarke evaluation, and they amended Student's proposed IEP accordingly. Id. at 323, 533-534. Student's speech and language therapy services were increased to 30 minutes, five days per week, and auditory training/rehabilitation was to be provided by a teacher of the deaf three times per week for forty minutes. Id. In addition, at Plaintiff's request, Student would be placed in a class using Spoken English as the primary language of instruction. Id.

In addition, BPS agreed to fund 24.5 hours (nine sessions) of individual audition and speech and language services, which were provided by Clarke between June 14 and July 14, 2014, as compensation for 26 hours of speech and language services that Student missed between the time he withdrew from Horace Mann, and the end of the 2014 school year. Id. at 323, 618. Plaintiff, however, was dissatisfied with the BPS's offer of compensatory services, and she later amended her BSEA hearing request to include a claim for compensatory services and other monetary damages. See AR at 90-95.

Student attended the first three sessions at Clarke without his processor, which had once again been lost. Id. at 323; 652-657. The processor was subsequently replaced with a new N6 processor, which Student wore to his remaining sessions. The Clarke therapy report describes Student as a non-verbal communicator who relies on signs and gestures, at times accompanied by vocalizations. Id. The evaluators did note some improvement over the four-week period Student attended Clarke, but concluded that in order for Student to continue to make progress, he would

need ongoing intensive therapy, and consistent follow-up audiological management. The evaluators also remarked that ongoing parent education would be of benefit. Id.

In the summer of 2014, the parties engaged in settlement discussions, some of which took place in the presence of the Hearing Officer, in an attempt to resolve (1) the school placement issue; and (2) whether BPS owed Plaintiff and N.S. any additional compensatory services beyond the 24.5 hours of services at the Clarke School, which BPS had already agreed to pay for. Plaintiff refused to send Student back to Horace Mann, but she consented to BPS sending a referral packet to both Clarke, and to another outside school known as the READS Collaborative ("READS"), so that the schools could evaluate Student for potential placement. Id. at 324.[2] Clarke determined that it could not accept Student into its programs because of his age and significant language and academic delays. Id. at 324-325. READS, however, indicated that it would accept Student into its program. On October 10, 2014, Plaintiff accepted BPS's offer to place Student at READS for the remainder of the October 2013 through October 2014 IEP period. Id. at 325. Plaintiff began attending READS in mid-October, 2014. Id. at 325.

On October 16, 2014, the parties and the Hearing Officer participated in a pre-hearing conference at the BSEA, and attempted to resolve the remaining issues – i.e., Plaintiff's request for compensatory services, and Student's IEP for the upcoming October 2014 through October 2015 school year. Id. at 216, 325. During the conference, counsel for BPS explained that settlement of the case was contingent on the resolution of issues relating to both school placement and compensatory services. Id.at 325. Specifically, BPS would not agree to resolve the placement issue if the matter of compensatory services issue was not resolved along with it.

---

[2] READS Collaborative is a private school in Norton, Massachusetts. It offers an educational program for children with hearing disabilities.

Id. During the pre-hearing conference, the parties orally agreed to the terms of a settlement, which included placing Student at the READS Collaborative for the IEP period of October 2014 through October 2015, inclusive of transportation and extended school year services; providing 20 hours of Speech and language services for Student; and reimbursing Plaintiff for certain transportation expenses she had incurred during the summer of 2014 Id. at 217, 325, 737-38. The proposed Settlement Agreement proposed that Student's IEP team would meet no later than December 2014 and revise Student's IEP to reflect this placement. Id. at 737.

The next day, however, Plaintiff emailed counsel for BPS and stated that while she was in agreement with the READS placement, she was no longer in agreement with the proposed resolution of the compensatory services issues. Id. at 325, 70-72. Upon learning that Plaintiff would not agree on all the settlement terms, BPS withdrew its settlement offer and notified Plaintiff that Student's placement at READS would be terminated. In addition, BPS filed an Expedited Hearing Request with the BSEA, seeking an order that its IEPs and placement of Student at the Horace Mann School satisfied its obligation to provide Student with a FAPE in the least restrictive environment. Id. at 194.

On October 22, 2014, Plaintiff filed a Motion for a Stay-Put Order, seeking to maintain Student's placement at READS pending resolution of the administrative proceeding before the BSEA. In a written decision dated October 29, 2014, the Hearing Officer granted Plaintiff's Motion. Id. at 151-153. The Hearing Officer explained that while Student's out-of-district placement at READS was "a result of Boston's good faith efforts to facilitate final resolution of the case through a settlement," rather than the result of an IEP Team's determination or a fully-executed settlement agreement, the purpose of IDEA's "stay-put" provisions is to

maintain a student's educational situation during the pendency of an IDEA appeal. Id. Accordingly, the Hearing Officer ordered that Student remain placed at READS during the pendency of the proceedings. Id. at 161.

In the regular course, a Team meeting was held on November 6, 2014 to develop an IEP for Student's 2014-2015 school year, despite the fact that Student was then attending READS pursuant to the Hearing Officer's Stay-Put Order. Id. at 816-830. BPS again offered Student placement at Horace Mann, with instruction in Spoken English and ASL. Id. Plaintiff rejected this IEP plan as well, and then challenged the adequacy of this proposed IEP within the ongoing BSEA administrative proceedings.

The Hearing Officer conducted an administrative hearing on November 17, 18, and 19, 2014, at which fifteen witnesses testified, and a combined 52 exhibits were considered. Id. at 302-337. The Hearing Officer received testimony from Student's teachers and other staff at Horace Mann – specifically, audiologist Lynne Graham O'Brien; teachers of the deaf Lita O'Malley, Rebecca Hart, Amanda Esar, and Ann Marie Accomando; speech and language pathologist Marci Goldowski; school psychologist Elizabeth Drake; and Headmaster Jeremiah Ford. Student's providers at Children's Hospital and Tufts Medical Center also provided testimony, including audiologist Jennifer Harris, and pediatric audiologist Lauren Scafort. In addition, Plaintiff testified at the hearing and called witnesses from the Clarke School and the READS Collaborative to provide testimony. The parties submitted written closing arguments on December 8, 2014. Id. at 243-301.

The Hearing Officer issued a 33-page written decision on January 2, 2015, which included detailed findings of fact supported by the hearing transcripts and documentary evidence. Id. at 302-337. Based on these findings, the Hearing Officer concluded as follows:

> The evidence supports a finding that Boston's proposed 2013-2014 and 2014-2015 IEPs offered Student a FAPE, and that Student's progress during the two and a half years in Boston was effective given: the interruptions in services caused by Parent; problems with Student's devices which caused him to spend lengthy periods without access to sound; methodological limitations which impacted Student's ability to acquire language; and the lack of effective access to language/communication in the home due to Parent's belief that hearing sound without the ability to understand language was sufficient for Student to acquire language and learn to speak. Placement at READS, although appropriate, was unnecessary and largely duplicative of the program and services offered Student at the Horace Mann School.

Id. at 328

In addition, the Hearing Officer determined that while Student was entitled to 26 hours of compensatory services, which corresponded to the the speech and language services that he missed after Plaintiff withdrew Student from BPS in March 2014, BPS had already compensated Plaintiff for 24.5 of those hours by paying for services at the Clarke School in June and July of 2014. Accordingly, the Hearing Officer held that BPS was only required to offer Student "1.5 hours of speech and language services reflective of the remaining compensation owed Student for the period from March to June 2014." Id. at 328, 335.

## II.      STANDARD OF REVIEW

The IDEA provides that courts reviewing agency decisions "(1) shall receive the records of the administrative proceedings; (2) shall hear additional evidence at the request of a party; and (3) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). The district court "reviews the administrative record, which may be supplemented by additional evidence from the parties, and makes an independent ruling based on the preponderance of the evidence." Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004) (internal quotations and citation omitted). "That independence," however, is "tempered by the requirement that the court give

'due weight' to the hearing officer's findings." <u>Id.</u> (quoting <u>Bd. of Educ. of Hendrick Hudson</u>

<u>Cent. Sch. Dist. v. Rowley</u>, 458 U.S. 176, 206 (1982)). The result is an "intermediate level of

review," <u>id.</u>, falling "somewhere between the highly deferential clear-error standard and the non-

deferential de novo standard." <u>Lessard</u>, 518 F.3d at 24. This standard reflects a concern that

courts "not substitute their own notions of educational policy for that of the state agency, which

has greater expertise in the educational arena." <u>Lt. T.B.</u>, 361 F.3d at 83-84.

       In an appeal from a final decision of the BSEA, the burden of proof is on the party

challenging the hearing officer's decision – here, Plaintiff. <u>See</u> <u>Hampton Sch. Dist. v.</u>

<u>Dobrowolski</u>, 976 F.2d 48, 54 (1st Cir. 1992). Furthermore, in IDEA cases, like other

administrative appeals, "a motion for summary judgment . . . is simply a vehicle for deciding the

relevant issues, and the non-moving party is not entitled to the usual inferences in its favor."

<u>Sebastian M.</u> 685 F.3d at 84-85.

       Accordingly, the Court has considered BPS's Motion for Summary Judgment, and

Plaintiff's Opposition thereto, in light of Administrative Record in its entirety, as well as certain

supplemental records submitted by Plaintiff, which include (1) Student's 2015 progress reports

from the READS Collaborative; and (2) certain 2015 medical records from Tufts Medical

Center. <u>See</u> [ECF No. 89] (Order allowing Plaintiff to supplement the record); [ECF No. 102]

(supplemental records).

## III.   ANALYSIS

       Plaintiff's Complaint [ECF No. 71] alleges that the final decision of the BSEA should be

vacated because the Hearing Officer (1) misapplied the burden of proof; (2) failed to weigh the

evidence appropriately; (3) erred in finding that BPS did not owe Student compensatory services

in excess of 1.5 hours; and (4) erroneously determined that Plaintiff was not a credible witness,

based on improper considerations. Plaintiff's Opposition to BPS's Motion for Summary

Judgment [ECF No. 101] introduces an additional argument – namely, that the Hearing Officer failed to consider Plaintiff's argument that Student should be "mainstreamed" instead of being placed in a substantially segregated program at Horace Mann. The Court examines each argument in turn.

### A. Burden of proof

Plaintiff does not appear to be pursuing her argument that the Hearing Officer misapplied the burden of proof, as this issue is not mentioned in Plaintiff's Opposition. See [ECF No. 101]. In any event, the Court finds no error in the Hearing Officer's allocation of the parties' respective evidentiary burdens. In her decision, the Hearing Officer noted that "Parent, the individual challenging the appropriateness of the proposed IEPs, and asserting compensatory claims, must prove her case by a preponderance of the evidence . . . ." AR at 328 (citing Schaffer v. Weast, 546 U.S. 49 (2005)). The Hearing Officer also stated that insofar as BPS filed its own hearing request seeking an affirmative determination that the proposed IEPs for the 2013-2014 and 2014-2015 school years were appropriate, BPS had the burden to present evidence to support its proposed findings.  See id. (noting that BPS "must also show that its program can offer Student a FAPE"). Because the parties had essentially filed cross-claims regarding the proposed IEPs, the Hearing Officer's assignment of respective burdens of proof was not erroneous. See Schaffer, 546 U.S. at 62 (burden of proof in administrative proceeding under the IDEA is placed upon the party seeking relief). Ultimately, the Hearing Officer determined that Parent failed to satisfy her burden of persuasion, but that BPS had met its burden of showing that the 2013-2014 and 2014-2015 IEPs offered Student a FAPE. See AR at 328.

### B. Weight of the evidence

Plaintiff raises two objections to the Hearing Officer's decision on the merits of the FAPE issue, one general, and one specific. First, Plaintiff asserts that the Hearing Officer placed

too much emphasis on the evaluations performed at Horace Mann in October 2013, because those evaluations took place at a time when Student did not have access to his processor. Plaintiff asserts that these test results should have been discounted. [ECF No. 71, p. 7]. The Court does not find this argument persuasive. The Hearing Officer was well aware that the 2013 evaluations had been completed without the processor, as she expressly noted this fact in her decision. AR at 330. Further, while Hearing Officer appears to have placed some evidentiary weight on the October 2013 evaluation, it was not the sole basis for her decision that BPS had offered Student a FAPE during the relevant periods. Rather, the Hearing Officer exhaustively reviewed all the evidence before her, including other evaluations that were performed at Horace Mann; the Clarke School, and Children's Hospital. The Court finds no error in the weight the Hearing Officer assigned to the 2013 evaluation and declines to disturb her findings in this regard.

Plaintiff also argues – from a more general standpoint – that Student's utter lack of progress during the years he attended Horace Mann demonstrates that the proposed IEPs did not offer Student a free and appropriate public education. [ECF No. 101, pp. 6-9]. As a threshold matter, the Court does not agree that Student failed to progress at Horace Mann. Shortly before he entered Horace Mann in 2011, Student's providers at Children's Hospital had noted that while he attempted to communicate through vocalizations, he could not produce any words; did not appear to understand spoken language; and was unresponsive to sign language. When Student's IEP Team convened in November 2012, however, they noted that Student had "made several gains in receptive/expressive language" over the course of the academic year, although he remained "significantly delayed for his age." AR at 392. By the fall of 2012, Student was able to identify a few alphabet letters, and the numbers 1 and 2 in written form; he was able to identify

and name the colors red and yellow. In addition, test results indicated that Student scored at the equivalent of 2.9 years on the Expressive Vocabulary Test, whereas the previous year, he scored below 2 years. Id.

Student continued to make slow progress over the course of the 2012-2013 year, particularly after he regained use of his processor. In December 2012, Student's classroom teachers reported that he was able to sign several words spontaneously, to name several of his classmates and teacher in sign language,  and to label and ask questions using simple words, or non-verbally. Id. at 403. He also imitated single words in sign and attempted to approximate speech in an effort to communicate. Id.

In January 2013, Dr. Clark at Children's Hospital made similar observations – notably, that Student was using gestures and signing, including seven spontaneous/independent signs. Dr. Clark observed that Student's clearest form of communication was though signing. Id. at 310, 408-413. Dr. Clark also opined that "[c]ontinued use of signing is essential for [Student's] development of linguistic competence," and that signing would "serve as a bridge to comprehension of sounds and spoken language." Id. at 411. Dr. Clark acknowledged, however, that Student was still "far behind" in language acquisition and development. Id.

The Hearing Officer further noted that while Student's progress was "slow," he had received little to no reinforcement in Sign Supported Spoken English or ASL at home, given his mother's resistance to the methodology. Id. at 330-331. The Hearing Officer also considered the fact that Student had not had access to his processor for nearly five months, which "seriously impacted" his ability to access spoken language. Id. at 331. She concluded that

> [g]iven that Student started in Boston with almost no language, and in light of the lack of carry-over into the home setting and the extended periods without his processor, the progress he did achieve between October 2011 and February 2014 can certainly be characterized as

> effective, albeit with on-going, significant delays. In viewing the totality
> of the record, the evidence is convincing that contrary to Parent's
> assertions, Student made effective progress while in Boston even if he
> was unable to fully close the gap between his skills and those of his
> hearing peers, a clearly unrealistic expectation in such a short period of
> time, given his significant language delays.

Id. at 331.

After reviewing the totality of the evidence, the Court concurs with the Hearing Officer's assessment. The record reflects that throughout Student's time at Horace Mann, Plaintiff resisted the recommendations of Student's educators and medical providers, nearly all of whom strongly recommended the use of sign-supported English and ASL as an essential language-acquisition methodology. Plaintiff's opposition was so strong, in fact, that Student's IEP Team ultimately conceded to her request to place Student in a classroom that did not use ASL at all, but instead relied exclusively on sign-supported Spoken English. Id. at 405. In light of these circumstances, the fact that Student's progress at Horace Mann was "slow" does not indicate that the IEPs failed to offer him a FAPE.

Furthermore, although Plaintiff is happy with Student's progress at the READS Collaborative, and wants BPS to continue funding this out-of-district placement, the Court notes that READS has been instructing Student in both ASL and Spoken English. Plaintiff has evidently become more receptive to this methodology since Student has been at READS, whereas she resisted BPS's efforts to instruct Student in ASL when he attended Horace Mann. The Hearing Officer concluded that "READS uses the same methodology that Boston had been recommending for years." AR at 333. The Court agrees with this conclusion, which is further supported by the recent READS progress reports that Plaintiff submitted in this appeal. [ECF No. 102]. Specifically, a READS Progress Report from April 2015 notes that the "primary language

of communication and instruction" in Student's classroom at READS is American Sign

Language. Id.  Another progress note from November 2015 states that Student

> has acquired some basic language skills through his immersion in an environment that uses American Sign Language and his expansion of ASL is assisting him in making sense of some spoken language. His acquisition of auditory and spoken language has not kept pace with his cognitive growth and he requires use of ASL to access information and curriculum.

Id.

Horace Mann is able to support a similar methodological model and has a similar student-teacher ratio to Student's current program at READS. And to the extent that the IEPs that BPS proposed for 2013-2014 and 2041-2015 academic years did not include the use of ASL, this was due to Plaintiff's specific and repeated requests to the contrary. Accordingly, the Court affirms the Hearing Officer's conclusion that BPS's proposed IEPs offered Student a FAPE in the least restrictive environment appropriate, and finds no error in the Hearing Officer's evaluation of the evidence.

### C.  Compensatory Services

Plaintiff's Complaint alleges that the Hearing Officer's decision on compensatory services was clearly erroneous, but Plaintiff does not pursue this argument in her Opposition to BPS's Motion for Summary Judgment. In any event, the conclusion that BPS's proposed IEPs offered student a FAPE requires that Plaintiff's claim for compensatory services be denied. "Compensatory education is a surrogate for the warranted education that a disabled child may have missed during periods when his IEP was so inappropriate that he was effectively denied a FAPE." C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist., 513 F.3d 279, 290 (1st Cir. 2008). Compensatory education, however, is "not an automatic entitlement but, rather, a discretionary remedy for nonfeasance or misfeasance in connection with a school system's obligations under

the IDEA." Id. Where, as here, there has been no nonfeasance or misfeasance, and the school

system has offered the Student a FAPE, Plaintiff's claim for compensatory services cannot

survive. See id. The Hearing Officer, therefore, committed no error in this regard.

Further, as BPS has already agreed to provide Student with the remaining 1.5 hours of

speech and language services, the Court hereby affirms the Hearing Officer's decision on the

compensatory services issue.

### D.  Credibility

Next, Plaintiff challenges the Hearing Officer's finding that she was not a credible

witness. Plaintiff contends that the Hearing Officer based her credibility finding on two improper

considerations: first, Plaintiff's alleged bias against public schools and preference for private

parochial schools; and second, Plaintiff's conduct during settlement negotiations that took place

at pre-hearing conferences.

After reviewing the Hearing Officer's credibility determination in context, it is clear that

the Hearing Officer did not discount Plaintiff's testimony in its entirety. In fact, the decision cites

repeatedly to Plaintiff's testimony to support certain factual findings. See, e.g., AR 311 (Parent

testified that getting to Waltham from Boston for a 3:00p.m. appointment was difficult); AR 312

(Parent testified that Student lost his speech processor on or about June 21, 2013); AR 319

(Parent testified that in December 2013, Student's grandfather became ill, and that this resulted

in Student's independent evaluations being delayed).

Further, the Hearing Officer addressed Plaintiff's credibility immediately after discussing

some tangential allegations that Plaintiff had raised during the proceedings – i.e., that she felt

Student had been subject to race discrimination at Horace Mann, and that she was concerned that

a BPS staff member might have molested Student in September 2013. The Hearing Officer found

that there was no evidence of racial discrimination or molestation, and noted that the Department

of Children and Families had previously dismissed the report of molestation. She then went on to

note that Plaintiff's credibility was "seriously compromised" for a number of reasons. Thus,

when read in context, the Hearing Officer's adverse credibility finding may be limited to

Plaintiff's allegations of racial discrimination and possible molestation, which were

uncorroborated by any evidence of record. Those accusations, moreover, were not directly

relevant to the central issue presented in this IDEA appeal: *i.e.*, whether BPS's proposed IEPs

offered Student a FAPE. Accordingly, even assuming that the Hearing Officer based her

credibility finding on improper considerations, Plaintiff has not persuasively demonstrated that

this credibility determination adversely affected the Hearing Officer's decision on the merits of

the Plaintiff's IDEA claim.

In any event, the Court does not agree that the Hearing Officer based her credibility

determinations on improper considerations. First, the Hearing Officer referenced Plaintiff's

alleged "lack of memory and insistence that Boston had not explained multiple times that its

offer for a READS placement was contingent on her acceptance of a settlement that fully

disposed of all claims against Boston, including compensatory services." AR 333. Here, the

Hearing Officer appears to be referring to the fact that during an October 16, 2014 prehearing

conference, Plaintiff had initially agreed to BPS's settlement proposal in toto, but later reneged

on the compensatory services aspect of the settlement, and claimed not to understand that BPS's

offer to place Student at READS was contingent on resolution of the compensatory services

question. Plaintiff argues that it was improper for the Hearing Officer to consider Plaintiff's

conduct during the pre-hearing conference, because (1) Federal Rule of Evidence 408 prohibits

evidence of conduct during compromise negotiations; and (2) the IDEA contains specific

statutory provisions stating that "[d]iscussions that occur during the mediation process shall be

confidential, and may not be used as evidence in any subsequent due process hearing or civil

proceeding." 20 U.S.C. § 1415(e)(2)(G).

Section 1415(e)(2)(G), however, does not apply here, because the settlement discussions

did not take place during a "mediation," as that term is described by the IDEA. The statute

provides that state educational agencies must "ensure that procedures are established and

implemented to allow parties . . . to resolve . . . disputes through a mediation process." 20 U.S.C.

§ 1415(e)(1). Such mediations must be conducted by an impartial mediator, and not by the

Hearing Officer. See id. § 1415(e)(2)(A)(iii). In accordance with Section 1415(e), the BSEA has

developed a Mediation program for Special Education Appeals, which is described in a brochure

available on the BSEA's website.[3] Here, in contrast, the discussions in question took place

during a prehearing conference before the Hearing Officer – not in a mediation with a third-party

mediator. See AR 54 (Order providing that October 16, 2014 hearing would be converted into a

Pre-hearing Conference). The BSEA's Hearing Rules for Special Education Appeals ("BSEA

Hearing Rules") expressly contemplate that settlement discussions may take place at prehearing

conferences. BSEA Hearing Rule V provides that the prehearing conference is intended to

"clarify or simplify the issues as well as review the possibility of settlement of the case."[4]

Notably, the BSEA Hearing Rules do not provide that matters discussed during pre-trial

conferences, or that the conduct of parties during those pre-trial conferences, must remain

confidential. Thus, the Hearing Officer did not violate any IDEA provision or BSEA Hearing

Rule by considering Plaintiff's conduct during the prehearing conference.

---

[3] BSEA Mediation Brochure, *available at* http://www.mass.gov/anf/hearings-and-appeals/bureau-of-special-education-appeals-bsea/ (last visited August 17, 2016).

[4] BSEA Hearing Rule V, *available at* http://www.mass.gov/anf/hearings-and-appeals/bureau-of-special-education-appeals-bsea/ (last visited August 17, 2016).

Similarly, although Plaintiff cites Federal Rule of Evidence 408, the Federal Rules of Evidence are not applicable to administrative proceedings before the BSEA. BSEA Hearing Rule X(C) provides that the Hearing Officer

> shall not be bound by the rules of evidence applicable to courts, but shall observe the rules of privilege recognized by law. Evidence shall be admitted only if it is the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs.

Thus, Fed. R. Evid. 408 does not apply here, and further, the Court does not find that the Hearing Officer erred or acted improperly by considering Plaintiff's conduct during pre-hearing proceedings. Specifically, although Plaintiff claimed not to have understood that resolution of the placement issue was contingent on resolution of the compensatory services issue, the Hearing Officer explained that she did not find Plaintiff to be credible on this point, because she had heard BPS's counsel explain the terms of the settlement proposal to Plaintiff during the pre-hearing conference. The Court sees nothing improper in the Hearing Officer's considering this fact in connection with her credibility assessment.

Nor did the Hearing Officer err by considering "Parent's admitted bias against public schools and insistence that all her children be educated in private schools." AR 333. Although Plaintiff suggests that the Hearing Officer violated Plaintiff's First Amendment right to free speech by considering Plaintiff's political beliefs about public schools, this is simply not so. "The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony.'" Davis v. Alaska, 415 U.S. 308, 316 (1974) (quoting 3A J. Wigmore, Evidence s 940, p. 775 (Chadbourn rev. 1970)); see also Udemba v. Nicoli, 237 F.3d 8, 17 (1st Cir. 2001) (noting that the fact finder "must assess the credibility of witnesses to determine the accuracy of their testimony, and information as to bias can be of great assistance in making such determinations"). Plaintiff contends that the Hearing

25

Officer was attempting to "punish" Plaintiff for her political beliefs, but the record belies this accusation. The Hearing Officer did not decide that Plaintiff was not credible simply because she prefers parochial schools to public schools. Rather, the Hearing Officer appropriately considered Plaintiff's admitted bias against public schools when assessing the weight of her testimony. This was neither erroneous, nor a violation of the First Amendment.[5]

### E.  Mainstreaming

Finally, Plaintiff argues that the Hearing Officer erred in finding that Student's placement at Horace Mann provided a FAPE in the "least restrictive environment possible" because Horace Mann is a segregated educational facility that does not permit Student to interact with this typically developing peers. [ECF No. 101, pp. 2-6]. Plaintiff contends that BPS's proposed placement at Horace Mann violates IDEA's preference for "mainstreaming" – *i.e.*, that disabled and non-disabled children should be educated together, "to the maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A). According to Plaintiff, Student "could easily have been accommodated in a more regular setting." [ECF No. 101, p. 5].

---

[5] Plaintiff also asserts a related argument – that the Hearing Officer exhibited bias against Plaintiff throughout the administrative proceedings. After reviewing the Administrative Record, Court finds no merit to these accusations, as there is no evidence that the Hearing Officer "prejudged facts" or that she based her decision on "actual bias or hostility" toward Plaintiff. See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 997-98 (1st Cir. 1990). In fact, the record reflects that the Hearing Officer conducted her duties in a highly professional manner, and that she consistently treated all parties, including Plaintiff, with courtesy and respect. Furthermore, not all of the Hearing Officer's decisions in this case favored the defendants. Although the Hearing Officer ultimately ruled against Plaintiff on the FAPE issue, she had previously granted Plaintiff's Motion for a Stay-Put Order, which allowed Student to maintain his outside placement at the READS Collaborative during the pendency of the proceedings. This fact significantly undercuts Plaintiff's allegations of bias. Moreover, the Hearing Officer afforded Plaintiff, a pro se litigant, with an equal opportunity to present evidence, examine witnesses, argue, and object at the hearing. Finally, the Hearing Officer's reasoned, written decisions on every critical issue that came before her demonstrate that her decisions were based on an impartial and thorough review of the evidence, and not any apparent bias or prejudice against the Plaintiff.

BPS, however, argues that Plaintiff is precluded from requesting mainstreaming as relief in this appeal, because Plaintiff did not raise the issue before the Hearing Officer. "[B]efore filing a lawsuit, 'IDEA mandates that plaintiffs exhaust administrative remedies through the due process hearing.'" Pollard v. Georgetown Sch. Dist., 132 F. Supp. 3d 208, 221 (D. Mass. 2015) (quoting Rose v. Yeaw, 214 F.3d 206, 210 (1st Cir. 2000)); see also 20 U.S.C. § 1415(i)(2)(A).

After reviewing the record, the Court agrees with BPS. During the proceedings before the BSEA, Plaintiff consistently advocated for Student's out-of-district placement at specialized schools for children with hearing impairments – namely, the Clarke School and/or READS Collaborative. Although Plaintiff did argue to the Hearing Officer that Student's placement at Horace Mann did not afford him an appropriate peer group,[6] Plaintiff never argued that Student should be "mainstreamed" into a classroom alongside his hearing peers. Nor does Plaintiff take that position in this appeal. Instead, she argues that Student should maintain his current placement at READS – not that he should be mainstreamed into a regular classroom within Boston Public Schools. Accordingly, the Court declines to consider Plaintiff's "mainstreaming" argument. See Valerie J. v. Derry Co-op. Sch. Dist., 771 F. Supp. 483, 488 (D.N.H.) ("[F]or issues to be preserved for judicial review they must first be presented to the administrative hearing officer."), order clarified, 771 F. Supp. 492 (D.N.H. 1991); E.H. v. New York City Dep't of Educ., No. 15 CIV. 3535 (RWS), 2016 WL 631338, at *7 (S.D.N.Y. Feb. 16, 2016) (refusing to consider issue not raised in administrative proceedings).[7]

---

[6] The Hearing Officer expressly addressed those peer-group contentions in her decision. See AR 332 n.18.

[7] This case does not fall into any permissible exception to the exhaustion requirement. See Pihl v. Mass. Dep't of Educ., 9 F.3d 184, 190 (1st Cir. 1993) ("Exhaustion may not be required where the pursuit of administrative remedies would be futile or inadequate; waste resources, and work

**IV.    CONCLUSION**

For the foregoing reasons, the Defendants' Motion for Summary Judgment [ECF No. 90] is <u>ALLOWED</u>, and the decision of the BSEA is hereby <u>AFFIRMED</u> in all respects. Judgment shall enter for Defendants BPS and BSEA on Plaintiff's IDEA claims.

Dated: August 17, 2016

/s/ Allison D. Burroughs
ALLISON D. BURROUGHS
U.S. DISTRICT JUDGE

---

severe or irreparable harm on the litigant; or when the issues raised involve purely legal questions.") Whether or not mainstreaming is appropriate is a fact-dependent question. The Hearing Officer had no opportunity to consider this issue in the first instance, and in the absence of a fully developed record, the Court declines to do so here.